**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| **STEAMSHIP TRADE ASSOCIATION** * | |
| **OF BALTIMORE, INC.,** *et al.,* | |
| * | |
| Petitioners/Counter-Defendants, | |
| * | **Case No. 1:22-cv-02876-JRR** |
| **v.** | |
| * | |
| **INTERNATIONAL LONGSHOREMEN'S** | |
| **ASSOCIATION, LOCAL 333** * | |
| | |
| Respondent/Counter-Plaintiff. * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

This matter concerns an arbitration award issued on October 7, 2022, in favor of Respondent/Counter-Plaintiff, which overturned the termination of a union member employee. Pending before the court are Petitioners/Counter-Defendants Steamship Trade Association of Baltimore, Inc. ("STA"), and American Sugar Refinery, Inc.'s ("ASR") Motion to Vacate Arbitration Award (ECF No. 2; the "STA Motion") and Respondent/Counter-Claimant International Longshoremen's Association, Local 333's ("Local 333") Motion to Enforce Judgment of Arbitrator (ECF No. 18; the "Local 333 Motion.") The parties' submissions have been reviewed and no hearing is necessary. Local Rule 105.6 (D. Md. 2023).

## BACKGROUND[1]

STA is a trade association composed of several members, one of which is ASR.  ASR operates a wharf and sugar refinery in the Port of Baltimore and employs members of Local 333 to unload raw sugar from vessels into the refinery.  (ECF No. 2-7 at 3.)  Riker McKenzie-El, a member of Local 333, was employed by ASR as a bulk discharge foreman.  *Id.*

## I.    Collective Bargaining Agreement

The matter before the arbitrator concerned disciplinary actions against McKenzie-El pursuant to a Collective Bargaining Agreement ("CBA") between STA, on behalf of its member ASR, and Local 333.  (ECF No. 2-7 at 3.)

The CBA sets forth a Grievance Procedure that governs disputes involving the application or terms of the CBA:

### Article XVII – Grievance Procedure

1. Grievance. Should any dispute, disagreement or controversy, including all issues involving the application and/or interpretation of the terms of this Agreement, hereinafter referred to as a grievance, arise between an individual member or members of the STA and the Union during the term of this agreement, you shall continue to work pending the resolution of the grievance in the following manner:

b. The grievance shall be referred in writing as soon as possible to the next regularly scheduled meeting of the Trade Practice Committee or to an emergency meeting which may be called by either party within twenty-four (24) hours written notice which may be

---

[1] Unless otherwise noted, the facts set forth in the Background are those set forth in the Opinion and Award issued by the arbitrator (the "Award").  The parties do not dispute the factual findings set forth in the Award, and it is not the role of this court to disturb the arbitrator's factual findings.  Therefore, the court accepts as true the facts set forth in the Award. *See Advantage Veterans Servs. of Walterboro, LLC v. United Steel, Paper & Rubber, Mfg., Energy, Allied Indus. & Serv. Workers,* 70 F.4th 751, 756 (4th Cir. 2023) (explaining that "courts 'do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts.' Instead, courts generally defer to an arbitrator's findings and reasoning.") (citing *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.,* 484 U.S. 29, 37-38 (1987); *Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union,* 76 F.3d 606, 608 (4th Cir. 1996)).

waived by the parties . . . . The Committee shall meet to discuss the grievance and, with each side designating an equal number of voting members which shall not be less than three (3), attempt to resolve the grievance.

c. In the event that the grievance is not resolved at the Trade Practice Committee, and upon written notice by either party which may be waived by the parties, a Committee of Six consisting of three (3) persons designated by the STA, . . . and three (3) persons designated by the Union, . . . shall meet as soon as possible to attempt to resolve the dispute.  A decision by the majority of this Committee shall be final and binding.

2.      Arbitration.   In the event of a deadlock by the Committee of Six on a grievance, the grievance may be submitted to arbitration by the Union or the STA, but only by the Union or the STA, in accordance with the following procedure:

a. Written notice of the submission of the grievance to arbitration shall be furnished by the party desiring arbitration to the other party within twenty (20) days after the deadlock of the Committee of Six. Within five (5) working days after receipt of the written notice of arbitration, the STA and the Union may attempt to select a mutually agreeable arbitrator to hear and determine the grievance.  If the STA and the Union are unable to agree upon the arbitrator within said five (5) working days, the party desiring arbitration shall request the Federal Mediation and Conciliation Service to submit to the STA and the Union a list of seven (7) arbitrators limited to arbitrators who reside within Region 7 and who are members of the National Academy of Arbitrators. Within five (5) working days after receipt of the list of arbitrators, the STA and the Union shall confer and shall alternatively strike names from the said list until one (1) name remains who shall be the arbitrator to hear and determine the dispute . . . .

c. The arbitrator shall not have the authority to amend or modify any of the terms of the applicable

Collective Bargaining Agreement. The arbitrator shall determine any questions of arbitrability.

d. The decision of the arbitrator shall be final and binding upon the STA, its constituent members, the Union and the employees covered by this Agreement. A decision by the Union not to submit a grievance to arbitration shall also be final and binding upon the employees covered by this Agreement.

(ECF No. 2-2 at 54-56).

The CBA also includes terms governing the discipline of employees covered by the CBA:

**Article XVIII Discipline**

1. No employee shall be disciplined in any fashion without prior notice to the Union. The discipline which may be imposed against an employee without prior approval of the Union shall be limited as follows:

a. Pilfering or broaching of cargo, theft, use or carrying of dangerous weapons on the employers' premises and willful destruction of property, and fighting (taking into consideration all of the relevant circumstances) are Major Offenses which may be dealt with as the circumstances may require, including discharge.

b. No employee shall be disciplined for other than a Major Offense unless:

i. prior written notices of such proposed discipline, including proposed warning letters, is [sic] given to the Union, which shall have the opportunity to respond before such action is implemented; and

ii. the employee has received at least one prior written warning for the same or equivalent offense within the last twelve (12) months in the case of a suspension for three (3) days or less or at least (2) prior written warnings for the same offense within the last (12) months in the case of a suspension for from four (4) to seven (7) days, or has

4

> received at least three (3) written warnings
> for the same offense within the last twelve
> (12) months in the case of a suspension for
> from eight (8) to thirty (30) days, or has been
> suspended for more than seven (7) days
> within the last twelve (12) months in the case
> of termination.

*Id.* at 56-57.   Article XVIII at subsection (1)(a) details disciplinary terms when an employee commits a "Major Offense," whereas subsection (1)(b) is the progressive discipline provision applicable in the case of non-Major Offenses.

**II.   Discipline and Termination of McKenzie-El**

In April 2019, Riker McKenzie-El was referred by Local 333 to ASR to work as a bulk storage foreman.  (ECF No. 2-7 at 4.)  McKenzie-El's supervisor was Raw Sugar Manager Eric Zollars.  *Id.* at 3.   While McKenzie-El was working as the foreman, several disputes arose regarding "working conditions" under the CBA.  ASR complained to Local 333 that McKenzie-El was not fulfilling his duties as the foreman.  *Id.* at 5.   Specifically, Zollars complained of McKenzie-El's tardiness, lengthy absences, and leaving the facility without notification.  *Id.* Local 333 claimed that Zollars micromanaged the operation in a manner that was neither conducive to productivity nor in conformity with the CBA.  *Id.*   McKenzie-El also claimed ASR discriminated against him based on his race and religion.  (ECF No. 2-7 at 5.)  These circumstances resulted in McKenzie-El receiving disciplinary action, including warning letters about his conduct and performance as the foreman.  *Id.*

On January 17, 2020, representatives from ASR met with Local 333 and McKenzie-El to discuss the ongoing disputes.  (ECF No. 2-7 at 6.)  Specifically, the purpose of the meeting was to clarify the foreman's job duties and address the previously issued warning letters and claims of discrimination.  *Id.*   Approximately two months following the meeting, McKenzie-El received a

letter from ASR stating that on March 21, 2020, he had left and failed to return to the facility without proper notice.  *Id.*  In connection with the incident of March 21, 2020, McKenzie-El was charged with his third no call/no show infraction, resulting in a five-day suspension.  *Id.*  The discipline was eventually rescinded.[2]  *Id.*

On March 23, 2020, McKenzie-El was issued another letter by ASR because he was not present at a vessel as his job duties required and failed to ensure the necessary workers were in place to begin operations on the vessel.  (ECF No. 2-7 at 7.)   The March 23 letter served as McKenzie-El's "first written warning falling under the progressive disciplinary measures" set forth at Article XVIII subsection (1)(b) of the CBA.  (ECF No. 2-10.)  On June 16, 2020, McKenzie-El was disciplined because he left the facility and failed to return.  Because this was McKenzie-El's second violation of progressive discipline under the CBA, he received a three-day suspension.  *Id.*

On July 30, 2020, events occurred that resulted in the third violation of progressive discipline and McKenzie-El's termination.  On that morning, Zollars went into the breakroom and saw McKenzie-El standing in the corner facing a wall.  (ECF No. 2-7 at 8.)  When Zollars inquired what McKenzie-El was doing, McKenzie-El responded that he was "taking a piss."  *Id.*  Zollars reported the incident to ASR's HR Manager, Mike Moore, via email, and indicated that other employees had observed McKenzie-El relieving himself in several different areas on the dock.  *Id.*  Moore initiated an investigation, which included interviewing Zollars and other employees regarding reports of McKenzie-El relieving himself.  *Id.* at 9.  One employee advised Moore that he had seen McKenzie-El relieve himself along the wall of the dock; another employee told Moore that he had seen McKenzie-El in the breakroom carrying a bedside urinal containing a liquid.  *Id.*

---

[2] According to McKenzie-El, he had a medical appointment and had informed management, but the appointment took longer than expected.  By the time the appointment concluded, it was too late to return to the dock.  (ECF No. 2-7 at 6.)

In connection with the investigation, Moore reviewed CCTV footage of McKenzie-El on the dock. Based on his review of the CCTV footage, Moore determined that the statements of Zollars and the other employees were credible. (ECF No. 2-7 at 9.) Moore further determined that McKenzie-El's behavior was contrary to the professional standards of behavior and the regulations promulgated by the Food and Drug Administration ("FDA") with respect to food manufacturers. *Id.* at 9-10. Based on his determinations, Moore (acting for ASR) terminated McKenzie-El and issued a termination letter dated August 14, 2020. *Id.* at 10. The termination letter explained that urinating in the breakroom and on the dock amounted to the "broaching of cargo and/or willful destruction of company property," a "Major Offense" under Article XVIII subsection (1)(a) of the CBA warranting immediate termination. (ECF No. 2-6.) The letter provided an alternative basis for termination under the progressive discipline provisions set forth in Article XVII subsection (1)(b) of the CBA. *Id.* The termination letter further stated that urinating on the dock on July 30, 2020, was McKenzie-El's third disciplinary violation within twelve months, which was grounds for termination under the CBA. (ECF No. 2-7 at 4.)

### III.  **Grievance Process and Arbitration**

McKenzie-El filed grievances on March 23, 2020, July 1, 2020, and August 13, 2020, challenging the disciplinary actions taken against him, including his termination. (ECF No. 2-7 at 3-4.) Arbitration hearings were held on February 24, 2021, January 6, 2022, and January 27, 2022. *Id.* at 4. The arbitration was conducted by virtual means, and all parties were represented by counsel. *Id.* The parties had the opportunity to present evidence and confront evidence presented by the opposing side. *Id.* The arbitration record was closed following post-hearing briefs summarizing the evidence and several motions to dismiss. *Id.*

7

By written award issued, October 7, 2022 (the "Award"), the arbitrator reinstated McKenzie-El and ordered that he receive back pay.  Importantly, the arbitrator found no just cause for the warning issued on March 23, 2020.  As a result, the arbitrator determined that McKenzie-El did not have three disciplinary violations within twelve months as required to support his termination under Article XVIII subsection (1)(b) of the CBA.  (ECF No. 2-7 at 1.)  Additionally, the arbitrator found that, although there was just cause for disciplining McKenzie-El for urinating in the break room and on the dock, such behavior did not qualify as a "Major Offense" under Article XVIII subsection (1)(a) of the CBA and, therefore, did not qualify as grounds for summary termination.  *Id.* at 2.

STA and ASR now move to vacate the Award on two bases: (1) enforcement of the Award is contrary to public policy; and (2) the arbitrator exceeded the scope of his authority because the Award does not arise from a legitimate construction of the CBA.  (ECF No. 2, ¶¶ 5-6.)  Local 333 counters that the Award does not run afoul of public policy and that the Award is based upon a legitimate construction of the CBA.  (ECF No. 18-1 at 7-8.)

## LEGAL STANDARD

"A court's review of a labor-arbitration pursuant to a collective bargaining agreement is very limited."  *Advantage Veterans Servs. of Walterboro, LLC v. United Steel, Paper & Rubber, Mfg., Energy, Allied Indus. & Serv. Workers,* 70 F.4th 751, 756 (4th Cir. 2023), *supra* (citing *Brown & Pipkins, LLC v. Serv. Emps. Int'l Union*, 846 F.3d 716, 723 (4th Cir. 2017)).  "In fact, the scope of judicial review of arbitration awards in general 'is among the narrowest known at law.'"  *Id.* (quoting *MCI Constructors, LLC v. City of Greensboro*, 610 F.3d 849, 857 (4th Cir. 2010)).  "In the labor context, courts' deferential standard of review stems from two principles. First is the 'decided preference for private settlement of labor disputes without the intervention of government' reflected in federal labor-management relations statutes."  *Id.* (quoting *United*

*Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 37-38 (1987)) (citations omitted.) "Second is that, by entering into a collective bargaining agreement, parties have contracted for the arbitrator to act as a factfinder and interpret the meaning of the contract, rather than a judge." *Id.* (citing *United Paperworkers,* 484 U.S. at 37-38.)

It is not the proper role of the court to "hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." *United Paperworkers,* 484 U.S. at 38. "Instead, courts generally defer to an arbitrator's findings and reasoning." *Advantage Veterans Servs.,* 70 F.4th at 756 (citing *Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union,* 76 F.3d 606, 608 (4th Cir. 1996)). "A court must affirm the award so long as the arbitrator 'is even arguably construing or applying the contract and acting within the scope of [her] authority . . . [even if the] court is convinced [she] committed serious error.'" *Id.* (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001)) (internal quotation marks omitted).

Notwithstanding the court's limited review of an arbitrator's award, the court must not abdicate its responsibility to "ensure that an arbitrator acted consistent with the agreement's contractually defined scope of authority." 70 F.4th at 756. "An award is illegitimate if it 'fails to draw its essence' from the agreement." *Id.* (quoting *Champion Int'l Corp. v. United Paperworks Int'l Union, AFL-CIO*, 168 F.3d 725, 729 (4th Cir. 1999)). "An arbitration award fails to draw its essence from an arbitration agreement when the award 'reflects merely the arbitrator's personal notions of right and wrong,' or 'the arbitrator's words manifest an infidelity' to the agreement." *Id.* (quoting *Clinchfield Coal Co. v. Dist. 28, United Mine Workers of Am. & Loc. Union No. 1452*, 720 F.2d 1365, 1368 (4th Cir. 1983)).

"Federal courts can refuse to enforce an arbitrator's award because it is contrary to public policy, but courts should be reluctant to do so." *District 17, United Mine Workers of America v. Island Creek Coal Co.*, 179 F.3d 133, 139 (4th Cir. 1999) (internal citations omitted). "[I]n any event, the question of public policy is ultimately one for resolution by the courts." *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber*, 461 U.S. 757, 766 (1983). If the CBA as interpreted by the arbitrator "violates some explicit public policy, [the court] is obliged to refrain from enforcing it." *Id.* Therefore, in order for this court to "vacate an award on public policy grounds, it must find that an explicit, well-defined public policy exists and the policy is one that specifically militates against the relief ordered by the award." *District 17,* 179 F.3d at 139 (citing *Misco*, 484 U.S. at 43); *see also W.R. Grace & Co.,* 461 U.S. at 766 (stating that a public policy must be "well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'") (quoting *Muschany v. United States*, 324 U.S. 49, 66 (1945)).

## ANALYSIS

Petitioners argue that the Award must be vacated because it is contrary to "a clear public policy of Baltimore City, the State of Maryland and federal regulations." (ECF No. 2, ¶ 5.) Petitioners also argue that the arbitrator exceeded his authority in finding no just cause for ASR's discipline letter of March 23, 2020, and effectively excising it from McKenzie-El's disciplinary record. *Id.* ¶ 6.

## I.    The Award and Opinion

The issues the arbitrator decided, and therefore are relevant to the court's analysis, are "[w]hether there was just cause to discipline the Grievant due to the three disciplines imposed by the Company" and "[w]ith respect to the final discipline, whether, under the language of the CBA[,] the Grievant's alleged urinations amounted to a major offense which warranted summary

termination.[3]  If not, whether the final incident be [sic] subject to progressive discipline and whether the final incident was a similar offense as provided under that language." (ECF No. 2-7 at 23.)

With respect to whether the first disciplinary action against Mackenzie-El was supported by just cause, the arbitrator determined:

> The first warning alleged that on March 23, 2020 Eric Zollars had provided the Grievant with a plan for discharge operations to commence at 0800 hours that morning. However, when it was time for the operations to begin the dozer drivers were not in in position to work and the Grievant had not made his way to the vessel. As a result, Mr. Zollars replaced the Grievant as foreman.  After the Grievant was replaced, it was discovered that the gang compliment was short one dozer driver and two coopers causing a delay in the discharge production.
>
> The Union[4] claimed that the Grievant's actions did not violate policy and did not result in any delay because there was rain that day in which the product in the bay of the ship was covered and no work could be performed. In support of its claim the Union submitted the weather forecast for March 23, showing that the total rainfall in the area would be approximately one-half inch. Mr. Zollars testified that 984,000 pounds of sugar was discharged on that day. According to the Daily Discharge Report [ARS 26] the vessel unloaded approximately 28% of the daily planned work and there were delays in the availability of one Crane from 0700 hours to noon and there were electrical issues in another. This gives substantial weight to the Union's assertion that there was little to no work performed that day. Even if one questions the amount of work performed on March 23, 2020, the delay in the discharge production was not the result of the Grievant's action. Accordingly, there was no just cause to warn the grievant in that instance since there was no connection between the Grievant's conduct and any incurred delay in production.

(ECF No. 2-7 at 25-26.)

With respect to McKenzie-El's termination on grounds that he urinated in the breakroom and on the dock, the arbitrator determined:

---

[3] The arbitrator refers to McKenzie-El as the "Grievant" and to ASR as the "Company."
[4] Local 333 is referred to as the "Union" in the Award.

11

The Grievant adamantly asserts that he did not urinate in the breakroom or in the dock. Yet the evidence established that the Grievant had previously confronted management about the unavailability of toilet facilities. Moreover, on August 14, 2020 the Grievant submitted a note from a medical office dated August 12 stating that he had been complaining of urinary urgency and incontinence. The note also stated that he has had this medical issue since 2010 which had been never addressed. The weight of this evidence despite the Grievant's denials support the conclusion that he indeed had a medical issue which resulted in uncontrollable urges to urinate. Unfortunately, due to his personal pride, the Grievant had not previously disclosed the issue and while arguing for more available toilet accomodations [sic], there is no evidence that he sought any accomodation [sic] from management.

While I find that the Grievant did indeed urinate on the dock and in the breakroom and find that discipline is appropriate for such conduct, I cannot agree that this should be treated as the Major Offense of the destruction of property. There is no evidence that the Grievant had any contact with any product. Indeed, the Company has a clear and significant interest in maintaining the quality of its product. It has several rules intended to comply with related food handling regulations. However, there is little evidence that these standards apply to dock workers who work in the open air and are subject to a variety of contaminants.

The evidence shows that the product when moved from a vessel is subject to many contaminants. The machinery used to move the product is not cleaned or sanitized to avoid contamination. There is no evidence that steps are taken to regularly clean the dock or the vessel to remove contaminants and there is no evidence that dockworkers are trained in practices to avoid contaminating product. Most importantly there is no evidence that individuals working in and around the vessel are given PPE to preserve the product or are otherwise trained in sanitary protocols. This most certainly is applicable in the environment where workers come into direct contact with product. However, such regulation does not appear to apply to those working on the dock or in the vessel.

While this is not a Major Offense, the Grievant's action is subject to discipline. In the termination letter, management found that the violation warranted a seven-day suspension. Such a suspension is supported but appeared to be imposed to justify a termination under the Article XVIII.1.b.ii. Based upon the language of the

> Agreement,[5] management could have imposed a greater suspension without it resulting in termination.

*Id.* at 31-32.

After addressing the issues before him, the arbitrator concluded:

> For the reasons set forth herein, the Grievance is sustained in part. There was no just cause to warn the Grievant on March 23, 2020. That warning shall be removed from the Grievant's records. However, there is just cause to discipline the Grievant for leaving work on June 16, 2020. Even though the discipline remains, since the March warning was removed, this became a first offense, and the 3-day suspension is reduced to a first warning. Finally, there is just cause to discipline the Grievant for urinating in the breakroom and dock. However, I do not find, for the reasons stated above that it was a major violation warranting summary termination. The Grievant's 7-day suspension remains.

*Id.* at 34.

## II.   <u>Public Policy</u>

In conducting its public policy analysis, the court is keenly mindful that its inquiry is not "whether the conduct of the employee, which was the subject of the arbitration award, violated public policy." *Exxon Shipping Co. v. Exxon Seamen's Union*, 788 F. Supp. 829, 837 (D. N.J. 1992). Rather, the court's focus is whether the "'arbitrator's interpretation of such contracts is limited to situations where the contract as interpreted' would violate the public policy." *Id.* (quoting *United Paperworkers Int'l Union v. Misco, Inc*., 484 U.S. 29, 43 (1987)). "Public policy considerations are wholly independent of the collective bargaining agreement." *Amalgamated Meat Cutters & Butcher Workmen of N. Am., AFL-CIO v. Jones Dairy Farm*, 680 F.2d 1142, 1144 (7th Cir. 1982). The Award at issue involves public policy considerations because the public, which is not represented or otherwise a participant in the arbitration, has an interest in ensuring that food products such as raw sugar are processed under sanitary conditions. *Id.*

---

[5] The arbitrator refers to the CBA as the "Agreement" in the Award.

The court "must, as a necessary first step, identify with specificity the existing laws and legal precedents underlying its decision." *Gulf Coast Indus. Worker Union v. Exxon Co., U.S.A.*, 991 F.2d 244, 249 (5th Cir. 1993).

Relevant to this case are the FDA regulations regarding cleanliness:

> The management of the establishment must take reasonable measures and precautions to ensure the following:
>
>> (b) Cleanliness. All persons working in direct contact with food, food-contact surfaces, and food-packaging materials must conform to hygienic practices while on duty to the extent necessary to protect against allergen cross-contact and against contamination of food. The methods for maintaining cleanliness include:
>>
>>> (1) Wearing outer garments suitable to the operation in a manner that protects against allergen cross-contact and against the contamination of food, food-contact surfaces, or food-packaging materials.
>>>
>>> (2) Maintaining adequate personal cleanliness.
>>>
>>> (3) Washing hands thoroughly (and sanitizing if necessary to protect against contamination with undesirable microorganisms) in an adequate hand-washing facility before starting work, after each absence from the work station, and at any other time when the hands may have become soiled or contaminated.
>>>
>>> (9) Taking any other necessary precautions to protect against allergen cross-contact and against contamination of food, food-contact surfaces, or food-packaging materials with microorganisms or foreign substances (including perspiration, hair, cosmetics, tobacco, chemicals, and medicines applied to the skin).

21 C.F.R. §§ 117.10(a), (b)(1)-(3) and (9). Further, the State of Maryland is concerned with maintaining sanitary conditions at food and drink processing facilities. *See* Md. Code. Regs. § 10.15.04.01*, Food and Drink Processing and Transportation* ("This chapter provides the

14

minimum food safety and sanitation requirements for food processing plants, including warehouses and transfer stations, and the transportation of food; . . . .").

Additionally, FDA regulations governing sanitary facilities and controls provide:

> Each plant must be equipped with adequate sanitary facilities and accommodations including:
>
> (a) Water supply. The water supply must be adequate for the operations intended and must be derived from an adequate source. Any water that contacts food, food-contact surfaces, or food packaging materials must be safe and of adequate sanitary quality. Running water at a suitable temperature, and under pressure as needed, must be provided in all areas where required for the processing of food, for the cleaning of equipment, utensils, and food-packaging materials, or for employee sanitary facilities.
>
> (b) Plumbing. Plumbing must be of adequate size and design and adequately installed and maintained to:
>
> > (1) Carry adequate quantities of water to required locations throughout the plant.
> >
> > (2) Properly convey sewage and liquid disposable waste from the plant.
> >
> > (3) Avoid constituting a source of contamination to food, water supplies, equipment, or utensils or creating an unsanitary condition.
> >
> > (4) Provide adequate floor drainage in all areas where floors are subject to flooding-type cleaning or where normal operations release or discharge water or other liquid waste on the floor.
> >
> > (5) Provide that there is not backflow from, or cross-connection between, piping systems that discharge waste water or sewage and piping systems that carry water for food or food manufacturing.
>
> (c) Sewage disposal. Sewage must be disposed of into an adequate sewerage system or disposed of through other adequate means.
>
> (d) Toilet facilities. Each plant must provide employees with adequate, readily accessible toilet facilities. Toilet facilities must be

kept clean and must not be a potential source of contamination of food, food-contact surfaces, or food-packaging materials.

(e) Hand-washing facilities. Each plant must provide hand-washing facilities designed to ensure that an employee's hands are not a source of contamination of food, food-contact surfaces, or food-packaging materials, by providing facilities that are adequate, convenient, and furnish running water at a suitable temperature.

(f) Rubbish and offal disposal. Rubbish and any offal must be so conveyed, stored, and disposed of as to minimize the development of odor, minimize the potential for the waste becoming an attractant and harborage or breeding place for pests, and protect against contamination of food, food-contact surfaces, food-packaging materials, water supplies, and ground surfaces.

21 C.F.R. §§ 117.34 (a), (b)(1-5), (c)-(f).

These regulations unequivocally establish the existence of a clear public policy favoring sanitary food processing. *See also* 21 C.F.R § 117.1(a)(1)(iii) ("The criteria and definitions in this part apply in determining whether a food is: Adulterated within the meaning of: Section 402(a)(4) of the Federal Food, Drug, and Cosmetic Act in that the food has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health.")

The court must now consider whether the Award violates public policy. Enforcement of the Award would amount to court-sanctioned unsanitary habits of employees in food processing facilities. Public policy considerations do not allow for such a result. The arbitrator's reinstatement of McKenzie-El was premised on the arbitrator's finding that, although urinating on the dock was an offense warranting discipline, it was not a Major Offense as defined by the CBA. (ECF No. 2-7 at 32.) The arbitrator supported his determination on the premise that the evidence did not demonstrate that food handling regulations applied to dock workers. *Id.* The arbitrator found that: there were other sources of contamination; there was no evidence the dock was

regularly cleaned/sanitized; and there was no evidence dock workers were trained in sanitary protocols or provided PPE.

*Id.*

> Article XVIII subsection (1)(a) of the CBA — Discipline provides:
>
>> No employee shall be disciplined in any fashion without prior notice to the Union. The discipline which may be imposed against an employee without prior approval of the Union shall be limited as follows:
>>
>> Pilfering or broaching of cargo, theft, use or carrying of dangerous weapons on the employers' premises and willful destruction of property, and fighting (taking into consideration all of the relevant circumstances) are Major Offenses which may be dealt with as the circumstances may require, including discharge.

(ECF 2-2 at 24.)

As set forth in the letter of August 14, 2020, ASR determined that, by urinating on the dock, McKenzie-El committed the Major Offense(s) of "broaching of cargo" and/or "willful destruction of property."  (ECF No. 2-6 at 3.)  The Award notes: "the term broaching of cargo has several meanings and is intentionally undefined" in the CBA.  (ECF No. 2-7 at 14.)  The arbitrator, however, did not proceed to construe the meaning or scope of the term "broaching of cargo" based upon principles of contract construction and interpretation; instead, the arbitrator concluded that McKenzie-El had not committed a Major Offense because – although "the Company has a clear and significant interest in maintaining the quality of its product" and "several rules intended to comply with related food handling regulations" – there are other sources of potential "product" contamination and dock workers did not appear to receive training in "sanitary protocols."

The arbitrator's application of the CBA violates public policy because the Award finds that, under the CBA, McKenzie-El had not committed a Major Offense by urinating in or around areas where food intended for human consumption is processed despite the "explicit public policy"

favoring sanitary food processing facilities and conditions. *United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc*., 484 U.S. 29, 36 (1987) (explaining that "a court's refusal to enforce an arbitrator's interpretation of such contracts is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests") (internal quotations and citations omitted).

Enforcement of the Award would excuse a worker from creating plainly unsanitary conditions, as that term is contemplated by the FDA, on the basis that other conditions not at issue in the arbitration might also run afoul of FDA regulations and the public policy on sanitary facilities found at 21 C.F.R. 117.1(a)(1)(iii).  Based on the Award, a worker's unsanitary behavior that contravenes express public policy regarding prevention of adulterated food for public consumption is to be excused where other sanitation protocols may be lacking.   FDA regulations unequivocally demonstrate the public policy that human excrement and bodily fluids should not come into contact with food intended for human consumption by mandating that waste plumbing and food plumbing be kept separate to avoid contamination.  These regulations, and the resulting public policy, are squarely at odds with the Award inasmuch as McKenzie-El urinated where raw food supply intended for human consumption was received for processing.

The court agrees with Petitioners.  "No employer in food production should be required to employ a supervisor who urinates with impunity along a pier where raw sugar cargo is being discharged." *See Amalgamated Meat Cutters*, 680 F.2d at 1144 (concluding that "insuring sanitary conditions in meat packing plants is an important public policy" and vacating arbitration award on public policy grounds finding that a work rule which precluded employees from reporting

unsanitary conditions to inspectors violated public policy).  Accordingly, based on public policy considerations, the Award will be vacated.

**III.    Scope of the Collective Bargaining Agreement**

Despite having concluded that the Award will be vacated on public policy grounds, for purposes of completion, the court will address Petitioner's alternative argument that the arbitrator exceeded the scope of the CBA.

As set forth earlier, notwithstanding the court's limited review of an arbitrator's award, the court must still "ensure that an arbitrator acted consistent with the agreement's contractually defined scope of authority." *Advantage Veterans Servs. of Walterboro, LLC v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l, Loc. 7898*, 70 F.4th 751, 756 (4th Cir. 2023).  "An award is illegitimate if it 'fails to draw its essence' from the agreement." *Id.* (quoting *Champion Int'l Corp. v. United Paperworks Int'l Union, AFL-CIO*, 168 F.3d 725, 729 (4th Cir. 1999)).  "An arbitration award fails to draw its essence from an arbitration agreement when the award 'reflects merely the arbitrator's personal notions of right and wrong,' or 'the arbitrator's words manifest an infidelity' to the agreement." *Id.* (quoting *Clinchfield Coal Co. v. Dist. 28, United Mine Workers of Am. & Loc. Union No. 1452*, 720 F.2d 1365, 1368 (4th Cir. 1983)); *but see United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc*., 484 U.S. 29, 36 (1987) (holding that "[a]s long as the arbitrator's award 'draws its essence from the collective bargaining agreement,' and is not merely 'his own brand of industrial justice,' the award is legitimate") (quoting *Steelworkers v. Enterprise Wheel & Car Corp*., 363 U.S. 593, 596 (1960)).

The Supreme Court in *Misco* cautioned:

> The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the

> contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.
>
> The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim.

484 U.S. at 36 (internal citations and quotations omitted).

Here, the arbitrator determined there was no just cause to issue the first disciplinary letter because McKenzie's El's actions were not the cause of the work delay.  Based on this determination, the arbitrator struck the three-day suspension levied by ASR's letter of March 23, 2020, which destroyed Petitioner's alternative basis for termination under the CBA.  The March 23, 2020, letter states in relevant part:

> THE ABOVE MENTIONED INCIDENT FINDS YOU IN VIOLATION OF YOUR AGREEMENT WITH AMERICAN SUGAR REFINING INC. WHICH STATES THAT YOUR PRIME RESPONSIBILITY IS TO FOLLOW THE DIRECTIVES OF THE ASR RAW SUGAR MANAGER, AND ADVISE HIM OF ANY AND ALL OBSTACLES TO MAXIMIZING THE SAFETY, REGULATORY COMPLIANCE, AND PRODUCTIVE DISCHARGE OF RAW SUGAR VESSELS.

(ECF No. 2-10.)

The arbitrator's basis for finding that the first discipline was issued without just cause is that "weather and mechanical" issues were the cause of the delay, not McKenzie-El's actions.  To be clear, the arbitrator did not find that McKenzie-El followed the directives given by Zollars or that ASR was incorrect in concluding that McKenzie-El had not fulfilled his duties — "Even if one questions the amount of work performed on March 23, 2020, the delay in the discharge production was not the result of the Grievant's action.  Accordingly, there was no just cause to

warn the grievant in that instance since there was no connection between the Grievant's conduct and any incurred delay in production."  (ECF No. 2-7 at 26.)

McKenzie-El was disciplined because he violated the CBA work terms.  The arbitrator essentially struck the letter of March 23, 2020, from McKenzie-El's work history because the arbitrator concluded ASR had been too heavy-handed — not because McKenzie-El was found not to have violated the terms of his job per the CBA.  The arbitrator's finding effectively requires that ASR sustain harm to its business before it can implement discipline.  Taken to its logical extension, the arbitrator's conclusion that ASR issued its March 23 discipline letter without just cause for failure of proof of harm to ASR would likewise render nugatory the letter of June 16 and the final discipline — as in neither instance is there a record of cognizable harm or damage to ASR, its facility, or its food production.  This does not draw from or reflect the essence of the CBA; nor is it, in the opinion of the court, a sensible or logical application of the CBA.  While workplace discipline surely may be invoked when a worker's violation has caused damage or harm to the workplace or its product, critically, if not ideally, disciplinary measures prevent harm in the workplace and corrects conduct that threatens same.  This conception of discipline is the essence of the CBA's progressive discipline protocol.

A disciplinary violation lies within the conduct of an employee, not the impact of that conduct.  Accordingly, the arbitrator did not draw from the essence of the CBA in determining there was no just cause to support the first disciplinary action.  Instead, the arbitrator went beyond the scope of the CBA to excuse McKenzie-El's workplace violation that resulted in the first of his three discipline letter warnings.  *See United Paperworkers*, 484 U.S. at 36 (explaining that an arbitration award is legitimate if it "draws its essence from the collective bargaining agreement, and is not merely his own brand of industrial justice") (internal quotations and citations omitted).

## IV.    CONCLUSION

For the reasons set forth herein, the STA Motion shall be granted, the Local 333 Motion shall be denied, and the Award shall be vacated on grounds of public policy and because it exceeds the scope of, and is not based on, the essence of the CBA.


/S/

_____
Julie R. Rubin
United States District Judge

August 24, 2023